United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ELIZABETH CLARK,<br><br>    Plaintiff,<br><br>  v.<br><br>CITY OF OAKLAND,<br><br>    Defendant._____/ | No. C 06-06872 CRB<br><br>**ORDER GRANTING IN PART MOTION FOR SUMMARY JUDGMENT & REMANDING** |

This lawsuit arises from Plaintiff Elizabeth Clark's employment at Defendant City of Oakland's Police Department ("OPD"). Now pending is Defendant's motion for summary judgment on all of Clark's claims. The Court GRANTS summary judgment as to Clark's claim under 42 U.S.C. § 1983. Defendant did not violate Clark's First Amendment rights because Clark did not engage in protected speech; Defendant did not violate Clark's Fourteenth Amendment rights because, as a probationary employee, Clark had no property interest in continued public employment. Because there was no actual deprivation of a right secured by the Constitution or federal law, the Court must also GRANT summary judgment as to Clark's claim of conspiracy under § 1983. Without any surviving federal claims, the Court exercises its discretion to REMAND Clark's supplemental state law claims to state court for adjudication in the first instance. See 28 U.S.C. § 1367(c)(3). The hearing scheduled for June 13, 2008 is VACATED.

**BACKGROUND**

OPD hired Plaintiff Clark in May of 2005; because Clark was already a Deputy Sheriff at the Alameda County Sheriff's Office, Clark entered through OPD's Lateral Transition Program. See Tucker Decl. ¶ 4; Clark Decl. ¶ 2. During her four years at the Sheriff's Office, Clark had served as a prison guard and a "death investigator." See Clark Depo. 26:5-27:12.[1] Clark had received training at the Alameda County Sheriff's Office's Academy, but she did not participate in the field training program and therefore had no patrol experience prior to joining OPD. See id. 37:24-38:13.

As a lateral, Clark was assigned to OPD's Lateral Academy, which at six weeks is a shorter and more streamlined version of OPD's regular police academy. See Tucker Decl. ¶¶ 5, 6; id. Exh. C. After the academy ended on May 20, 2005, OPD assigned Clark to the Field Training Program where Clark was supervised by Field Training Officer ("FTO") Sean McClure.[2] See id. ¶ 8. As Clark's FTO, Officer McClure was responsible for observing and documenting Clark's work performance. See id.

Because Officer McClure was on vacation for the first week of field training, Clark was supervised during her first week by Sergeant Jack Peterson. See Peterson Decl. ¶ 3. According to Sgt. Peterson, there was one particular incident that occurred during the first week wherein "Clark nearly got me killed." Id. ¶ 4. Sgt. Peterson and Clark were patrolling a heavy narcotics area when they stopped a car to talk to the driver. See id. There were three individuals in the car: one driver, one passenger behind the driver and another behind the passenger seat. See id. The officers observed alcohol and Sgt. Peterson detained the driver, who was on parole. According to Sgt. Peterson, Clark failed to shine her light into the car

---

[1] As a prison guard, Clark guarded inmates and took care of their basic needs. See id. 26:6-14. As a death investigator, Clark recovered bodies from the field and created a report detailing the field scene. See id. 27:9-21.

[2] According to OPD's Chief of Police Wayne Tucker, the Field Training Program's purpose is to hone and perfect the field skills an officer possesses as a result of the training academy; because officers in field training are engaged in "real life" situations, the program is not intended to teach basic skills such as car stops, search and seizure, and arrest techniques. See id. ¶ 9.

2

1    and therefore failed to observe the butt of a gun sticking out of the seat pocket behind the
2    driver's seat.  See id. ¶ 6.  Clark then conducted a patdown of the passenger sitting where the
3    gun was found, but failed to find crack cocaine in the front shirt pocket of the passenger.  See
4    id. ¶ 7.  Sgt. Peterson felt that his safety was "endangered by Clark's incompetence."  Id. ¶ 8.

5           Sgt. Peterson did not mention in any report that Officer Clark had missed the gun, did
6    not include the incident in the event's police report, and did not notify the Field Training
7    Coordinator, Mitch Powell, of the incident that evening.  See Peterson Depo. 24:13-25:3.
8    According to Sgt. Peterson, he did discuss the event with Sgt. Powell within a week or so.
9    See id. at 25:10-15.

10          After the incident, Clark admitted that she did not know much about car stops and did
11   not have much training with respect to car stops at the Alameda Sheriff's academy.  See id. ¶
12   9.  But according to Clark, it was Sgt. Peterson who first approached the car on the driver's
13   side and therefore Peterson's fault that the gun was not initially discovered.  See Clark Decl.
14   ¶ 4.  Clark maintains that she was responsible for maintaining control over the two
15   passengers, not for searching the car.  See id. ¶ 5.

16          After Officer McClure returned from vacation, he assumed formal responsibility over
17   Clark's training.  According to McClure, "Clark immediately exhibited numerous problems
18   in the field."  McClure Decl. ¶ 5.  McClure identified Clark's "lack of being proactive" as her
19   primary problem.  Id. ¶ 6.  This problem exhibited itself in Clark's inability to make quick
20   decisions and observe proper field procedure.  See id.

21          As part of his duty as FTO, Officer McClure completed Daily Observation Reports
22   ("DORs") for Clark.  A review of McClure's DORs reveal that Clark received numerous
23   marks of "acceptable" or even "better than acceptable," but most DORs also included marks
24   of "less than acceptable" for knowledge of policies and procedures, knowledge of criminal
25   statutes, officer safety: general, use of time, comprehension of radio codes, officer safety:
26   arrest and control, investigative skill, interview skill, and preparedness.  See McClure Decl.
27   Exh. A.
28

Officer McClure's observations were corroborated in part by Officer Pat Mahanay, who worked alongside Clark for one or two days. It was "immediately apparent" to Officer Mahaney that Clark "had no prior patrol experience," and "appeared lost when it came to handling confrontational situations in the field and had difficulty making decisions." Mahaney Decl. ¶ 4. Officer Mahaney filled out a DOR for Clark on at least one day, giving her marks of less than acceptable for knowledge of policies and procedure and problem solving: decision making, but marks of at least acceptable for all other categories. See id. Exh. A.

Officer McClure's supervision of Clark ended on July 4, 2005. The next day, Clark met with Mitch Powell, the Field Training Coordinator. During the meeting, Clark raised concerns about her training experience with Officer McClure. See Clark Decl. ¶ 6. In addition, Clark handed Officer Powell a four-page letter detailing her objections to McClure's training techniques. Clark complained that McClure treated her like a "moronic idiot," ridiculed and belittled her, undermined her confidence, brow-beat her, called her "timid and meek," and generally made Clark feel like she could not do anything right. See Clark Decl. Exh. A. Clark also complained that Officer McClure "pushed self-initiated stops and told me I didn't seem very excited about 'jacking people up' and yet he never showed me how to do any of these things he was requesting of me." See id. Exh. A.

After the meeting, Clark went out on patrol but was soon redirected back to Officer Powell's office. See Clark Decl. ¶ 7. Officer Powell told Clark that he had spoken with Sgt. Peterson after their discussion and that it appeared Clark's patrol procedures were deficient. See id. ¶ 8. Officer Powell recounted Sgt. Peterson's recollection of the car stop where Clark allegedly failed to position herself correctly during the initial approach, missed drugs during a patdown, and failed to locate a gun in the car's back seat pocket. See id.

4

According to Officer Powell, he had learned about the incident with Sgt. Peterson on July 4 – the day before Clark came in to talk about her concerns with Officer McClure.[3]  See Powell Decl. ¶ 11.  Between July 4 and July 5, Officer Powell met with numerous training staff including Lt. Ricardo Orozco, Sgt. Ray Backman, Officer Nancy Cerecedes, Officer Norm del Rosario, and Officer Espinoza.  All agreed that Clark's deficiencies and lack of experience hampered her ability to perform in the Lateral Transition Course.  See id. ¶ 16.  All agreed that Clark should leave the field training program before she got hurt or caused someone else to get hurt.  See id.

According to Officer Powell, when he met with Clark on the afternoon of July 5, he explained that he had met with the training staff, and Clark agreed that she did not have the skills of other laterals due to her lack of patrol experience.  See id. ¶ 17.  Clark maintained that she wanted to complete the field training program as planned, but Officer Powell stated that he was going to recommend to Chief Tucker that she be removed from the program and be provided additional training in the police academy.  See Clark Decl. ¶ 9.  Officer Powell told Clark to return in a couple of hours, id., and he then met with Chief Tucker.  Chief Tucker agreed that Clark presented a risk to herself and other officers, and concluded that it would be appropriate to give Clark the opportunity to improve her skills as a Police Officer Trainee in the basic police academy.  See Tucker Decl. ¶ 12.

When Clark returned to Officer Powell's office, she was told to resign from her officer position and accept a police officer trainee position in the next academy.  See Clark Decl. ¶ 10.  That afternoon, the afternoon of July 5, Clark resigned from the field training program immediately to accept a position as a trainee.  See Tucker Decl. Exh. E.  Four days later, Clark sent Chief Tucker a memorandum complaining about her predicament.  See Clark Decl. Exh. B.  Clark acknowledged being stunned and complained, "I now feel I am being punished for coming forward with my concerns with the training and treatment I had

---

[3] Clark disputes Officer Powell's recollection.  She maintains that Officer Powell admitted that he did not talk to Sgt. Peterson until after Clark had vocalized her complaints about Officer McClure.  See Clark Decl. ¶ 8.

5

1 received from Officer McClure." Clark maintained that although she lacked some patrol 2 skills, she was progressing through the field training program, and any lack of learning was 3 attributable to Officer McClure's sarcastic and abusive teaching style. Clark contended that 4 she could still successfully complete the field training program if given the opportunity, but 5 if forced to go through the academy, she would finish as one of the top recruits.

6 Clark commenced in the 155th Police Academy on July 11, 2005. See Clark Decl. ¶ 7 11. On July 16, Clark collapsed at training and had to be transported to the emergency room. 8 Id. ¶ 13. Clark subsequently discovered that she suffered from a condition called 9 Rhabdomyolysis, which results in the destruction or degeneration of skeletal muscle tissue 10 accompanied by the release of muscle cell contents into the bloodstream.[4] Clark was 11 released the same day, but was readmitted on July 19 and kept for five more days. While 12 recovering from limb swelling, Clark was visited by Recruit Training Officer Cerecedes, 13 who told Clark that if she spent too much time in the hospital, she might have to be removed 14 from the academy. Clark Decl. ¶ 13. The hospital discharged Clark on July 24, and she 15 returned to light duty at the academy the next day with restrictions to avoid physical activity. 16 See Backman Decl. ¶ 3.

17 Clark continued to experience issues related to swelling and was absent. Due to her 18 absences, Sgt. Backman of the Internal Affairs Division notified Clark that a trainee could 19 miss no more than 5% of the basic course hours. See id. On September 30, Clark reported 20 her health concerns with Officer Cerecedes, explaining that her white blood cell count was 21 dangerously low and that she should not perform physical activity. See Cerecedes Decl. ¶ 7. 22 Clark admitted that she felt fatigued and had not seen improvements in her health, see id., 23 and Cerecedes sent her home as a liability, see Clark Decl. ¶ 14. On October 5, 2005, Clark 24 advised Officer Cerecedes that her primary doctor would not clear her back to full duty

---

[4] Declarations submitted by the defendant suggest that officers at the academy believed, and still believe, Clark collapsed due to "heat exhaustion," Backman Decl. ¶ 3, and/or "dehydration," Cerecedes Decl. ¶ 5, rather than because of Clark's underlying condition. There is no medical evidence in the record to confirm either Plaintiff's or Defendant's position.

without restrictions. See id. ¶ 17. According to Officer Cerecedes, Clark said she would resign because she was not being medically cleared. See Cerecedes Decl. ¶ 8.

On October 12, Lt. Downing of the Internal Affairs Division spoke to Clark about her future. Lt. Downing asked whether Clark intended to resign, attend a future training academy, or wanted another non-sworn position with the City. See Downing Decl. ¶ 6. Clark asked for time to consider her options, but Lt. Downing ordered Clark to produce something in writing about what Clark hoped to get out of the process. See Clark Decl. ¶¶ 18-20. In response, Clark submitted a letter refusing to resign and stating that she would not accept any position with OPD other than as a police officer. See Downing Decl. Exh. A.

Clark then continued as an employee of the City of Oakland – but in a nonworking, unpaid status – for over two years. In December of 2007, Clark's personal physician cleared her for full duty. See Clark Decl. ¶ 21. Clark went into OPD on December 13, 2007 and said she had prescheduled vacation plans, but requested a return to work date of December 27, 2007. See Guttormson Decl. ¶ 3. Sgt. Mary Guttormson, OPD's Academy Coordinator, okayed the vacation plans but told Clark to report on December 27 in physical training gear. See id. ¶ 4. Sgt. Guttormson confirmed that Clark was classified as a Police Officer Trainee, but Clark said she would not participate in physical training. See id. Clark did not report to work on December 27 as scheduled. Because she did not report to work and was officially Absent Without Leave, Sgt. Guttormson recommended that Clark be removed from her position as a Police Officer Trainee. See id. ¶ 7.

By letter dated December 28, 2007, Clark wrote to state that she was unwilling to return as a trainee. See Tucker Decl. Exh. H. Clark stated that she "was injured once during academy training, as a result of" punishment and "I refuse to allow this to happen again." Id. The City interpreted Clark's letter as an intentional abandonment of employment and therefore considered Clark's employment with the OPD to have terminated effective December 28, 2007. See Tucker Decl. Exh. I.

Clark filed suit in state court in September of 2006. The case was removed to federal court on the basis of federal question jurisdiction. Plaintiff's second amended complaint

7

("SAC") pleads six causes of action: (1) violation of 42 U.S.C. § 1983; (2) conspiracy to violate § 1983; (3) failure to accommodate in violation of California Government Code § 12940; (4) disparate treatment in violation of California Government Code § 12940; (5) violation of the right to privacy as protected by the California Constitution; and (6) violation of California Labor Codes §§ 1050, 1052. Defendant now moves for summary judgment on all claims.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A fact issue is "material" only if it could affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A fact issue is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. Id.

A principal purpose of the summary judgment procedure is to isolate and dispose of factually unsupported claims. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment has the burden to show initially the absence of a genuine issue concerning any material fact. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 159 (1970). This can be done by either producing evidence negating an essential element of the plaintiff's claim, or by showing that plaintiff does not have enough evidence of an essential element to carry its ultimate burden at trial. See Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc., 210 F.3d 1099, 1103 (9th Cir. 2000). Once the moving party has met its initial burden, the burden shifts to the nonmoving party to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). To discharge this burden, the nonmoving party cannot rely on its pleadings, but instead must have evidence showing that there is a genuine issue for trial. See id. at 324.

Special rules of construction apply to evaluating summary judgment motions: (1) all reasonable doubts as to the existence of genuine issues of material fact should be resolved against the moving party; and (2) all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

**DISCUSSION**

Clark alleges two federal counts: violation of 42 U.S.C. § 1983 and conspiracy to violate § 1983. In relevant part, § 1983 provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress. . . .

Section 1983 "open[s] the federal courts to private citizens, offering a uniquely federal remedy against incursions under the claimed authority of state law upon rights secured by the Constitution and laws of the Nation." Mitchum v. Foster, 407 U.S. 225, 239 (1972). Here, Clark seeks redress for alleged violations of two constitutional rights: the First Amendment's right to freedom of speech and the Fourteenth Amendment's right of due process.

I. 42 U.S.C. § 1983: First Amendment

In her first cause of action, Clark alleges that the defendant retaliated against her for exercising constitutionally-protected free speech rights by coercing her to resign from her position as a police officer and enter the police training academy in direct response to her complaints about Officer McClure's training methods.

To establish a First Amendment claim against a public employer, a public employee must show: (1) the employee engaged in constitutionally protected speech, (2) the employer took adverse employment action against the employee, and (3) the employee's speech was a substantial or motivating factor in the adverse action. See Freitag v. Ayers, 468 F.3d 528, 543 (9th Cir. 2006). The Court finds that summary judgment is appropriate because Clark cannot establish that she engaged in constitutionally protected speech.

9

1    To qualify as protected speech under the first element, the employee must establish
2 that she "spoke as a citizen on a matter of public concern." Garcetti v. Ceballos, 547 U.S.
3 410, 418 (2006). If she did not, then the employee has no First Amendment cause of action
4 based on her employer's reaction to the speech. See id.

5    "Analysis of public concern is not an exact science." Weeks v. Bayer, 246 F.3d 1231,
6 1234 (9th Cir. 2001). The Court's inquiry turns, first and foremost, on the content of the
7 speech. See id. When the employee addresses "'issues about which information is needed or
8 appropriate to enable the members of society' to make informed decisions about the
9 operation of their government," that speech falls squarely within the boundaries of public
10 concern. McKinley v. City of Eloy, 705 F.2d 1110, 1114 (9th Cir. 1983) (quoting Thornhill
11 v. Alabama, 310 U.S. 88, 102 (1940)). Contrarily, a public employer may constitutionally
12 suppress an employee's speech addressing "matters only of personal interest" such as
13 personnel matters pertaining to the speaker's job performance or terms and conditions of
14 employment. Pinard v. Clatskanie School Dist. 6J, 467 F.3d 755, 766 (9th Cir. 2006)
15 (quoting Connick v. Myers, 461 U.S. 138, 147 (1983)).

16    The speech at issue in Clark's § 1983 claim is set forth in a four page letter submitted
17 to Officer Powell, detailing Clark's concerns with the field training provided by Officer
18 McClure. The letter is replete with matters of purely private concern, such as that Officer
19 McClure "brow beat" and failed to sufficiently support Clark in her training. There can be
20 no doubt that these statements do not trigger the protections of the First Amendment because
21 they concern "individual personnel disputes and grievances." McKinley v. City of Eloy, 705
22 F.2d 1110, 1114 (9th Cir. 1983).

23    Clark argues that her speech is entitled to constitutional protection because the letter
24 documented her concern that "McClure insisted that [she] 'jack people up,' i.e. make car
25 stops and walking stops without cause or reason, in order to further [her] training." Clark
26 Decl. ¶ 6. But a faithful reading of the letter does not support Clark's assertion; Clark did not
27 complain that McClure was initiating stops without cause. In actuality, the letter states,
28 "[McClure] pushed self-initiated stops and told me I didn't seem very excited about 'jacking

10

people up' and yet he never showed me how to do any of these things he was requesting of me." See id. Exh. A.  It is plain that Clark's concern was that Officer McClure was asking her to make proactive stops – not necessarily stops without cause – and that Officer McClure was disappointed in Clark's ability to become enthused about "jacking people up," that is, stopping people.  See Powell Depo. 63:7-18.  Clark did not want Officer McClure to cease making self-initiated stops, she wanted Officer McClure to better explain how to do it.  A fair reading of the letter compels the conclusion that this complaint was merely, like all the others, a personnel grievance that Clark wanted to bring to the attention of Officer McClure's supervisor.

In addition to examining the speech's content, the Court must consider its form and context, including factors such as the public or private nature of the speech and the speaker's motive.  Weeks v. Bayer, 246 F.3d 1231, 1235 (9th Cir. 2001).  This examination only reinforces the Court's conclusion that Clark's speech is unprotected.  The private letter was submitted in a closed-door meeting with a supervisor for the express purpose of providing "a constructive, worthwhile evaluation" of Clark's training experience with Officer McClure.  Concerned with the criticism leveled by Officer McClure, "the point of [Clark's] speech" was to respond to McClure and to retaliate; in short, the letter's purpose was to address a private personnel dispute, not to "urg[e] reform of a wayward policy in a manner that might suggest public-mindedness."  Id. at 1236; Chateaubriand v. Gaspard, 97 F.3d 1218, 1223 (9th Cir. 1996).  Clark did not engage in constitutionally protected speech; accordingly, Defendant is entitled to summary judgment on Count One as predicated on the First Amendment.

II. 42 U.S.C. § 1983: Due Process

In Count One, Clark also alleges that when she was coerced into resigning as a lateral police officer and ordered to enter the training academy, the defendant violated her procedural due process rights by failing to provide a notice and hearing.  The Court grants summary judgment on Clark's due process claim because the City did not deprive Clark of a property interest.

11

1	The Fourteenth Amendment's due process guarantee applies to public employees who
2	have a "property interest" in the terms or conditions of their employment.  See Bd. of
3	Regents v. Roth, 408 U.S. 564, 576 (1972).  To sustain a § 1983 due process claim on a
4	motion for summary judgment, a public employee has to allege facts from which a
5	reasonable fact finder can conclude that: (1) the employer deprived the employee of a
6	property interest, and (2) it did so without due process of law.  See Huskey v. City of San
7	Jose, 204 F.3d 893, 900 (9th Cir. 2000).

8	Here, Clark argues that she had a property interest in continued employment – and all
9	of its attending benefits – with the OPD.  To determine whether Clark had a right to keep her
10	job as a lateral police officer, the Court must turn to state law and the contractual terms
11	controlling Clark's employment with OPD.  See Bollow v. Federal Reserve Bank of San
12	Francisco, 650 F.2d 1093, 1098 (9th Cir. 1981).

13	As a lateral police officer, Clark was a probationary employee for the first twelve
14	months of employment, as established by the Memorandum of Understanding ("MOU")
15	between the City of Oakland and the Oakland Police Officers Association.  See Tucker Decl.
16	¶ 5; id. Exh. C.  "Under California law, a probationary civil service employee ordinarily has
17	no property interest in continued public employment and may be dismissed without a hearing
18	or judicially cognizable good cause."  McGraw v. City of Huntington Beach, 882 F.2d 384,
19	389 (9th Cir. 1989); see also Lubey v. City and County of San Francisco, 98 Cal. App. 3d
20	340, 345 (1979) ("It is settled law that a probationary (or nontenured) civil service employee,
21	at least ordinarily, may be dismissed without a hearing or judicially cognizable good cause.
22	Such a dismissal does not deprive the employee of a vested, or property, right.").

23	A probationary employee might have a property interest in continued public
24	employment if the applicable state law or governing contract "restricts the grounds on which
25	an employee may be discharged such that even a probationary employee could have a
26	reasonable expectation of continued employment."  McGraw, 882 F.2d at 390 (internal
27	quotation omitted).  Thus, it is not enough to observe that Clark was a "probationary
28	employee"; the Court must also inquire whether this is the unusual case where state law

endowed Clark with a constitutionally protected property interest by imposing substantial restrictions on OPD's decisionmaking.  See Dorr v. Butte County, 795 F.2d 875, 876 n.1 (9th Cir. 1986); Clemente v. United States, 766 F.2d 1358, 1364-65 (9th Cir. 1985).  But a review of the City of Oakland's Civil Service Rules reveals that there are no substantial limitations on the right of the OPD to demote a lateral police officer to the position of police officer trainee.  See City of Oakland Civil Service Rules § 6.05.  As a result, Clark had no reasonable expectation of continued employment and therefore can maintain no "legitimate claim of entitlement."  Bd. of Regents v. Roth, 408 U.S. at 577.  Defendant's motion for summary judgment is GRANTED as to Clark's due process claim.

### III. Conspiracy to Violate 42 U.S.C. § 1983

In Count Two of her complaint, Clark alleges that Officer Powell conspired with others to violate her constitutional rights in violation of § 1983.  Because the Court grants summary judgment on Count One, Clark has no surviving claims based on § 1983.  "While conspiracies may be actionable under section 1983, it is necessary that there have been, besides the agreement, an actual deprivation of a right secured by the Constitution and laws."  Landrigan v. City of Warwick, 628 F.2d 736, 742 (1st Cir. 1980), cited in Dooley v. Reiss, 736 F.2d 1392, 1395 (9th Cir. 1984).  Because Clark has established no deprivation of her constitutional rights, she cannot sustain a claim for conspiracy under § 1983.  Accordingly, the Court GRANTS summary judgment as to Count Two.

### IV. Supplemental Jurisdiction

Having dismissed Clark's federal claims, the Court has discretion whether to continue to exercise supplemental jurisdiction over her state law claims.  See 28 U.S.C. § 1367(c)(3). The Supreme Court has stated, and the Ninth Circuit has often repeated, that "in the usual case in which all federal-law claims are eliminated before trial, the balance of factors . . . will point toward declining to exercise jurisdiction over the remaining state-law claims." Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988).  In this case, those factors – including principles of economy, convenience, fairness, and comity – favor remand.  See

United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 727 (1966).  Accordingly, the Court REMANDS Counts Three through Six for adjudication in state court in the first instance.

**IT IS SO ORDERED.**

Dated: June 6, 2008

CHARLES R. BREYER
UNITED STATES DISTRICT JUDGE